# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| DOUGLAS STRYSIK, | ) | |
| | ) | No. 13 CV 7723 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner, Social Security | ) | |
| Administration, | ) | |
| | ) | December 10, 2015 |
| Defendant. | ) | |

## MEMORANDUM OPINION and ORDER

Douglas Strysik applied for supplemental security income ("SSI") based on his claim that a combination of his degenerative disc disease, depression, and anxiety render him unable to work. After an administrative law judge ("ALJ") denied his application and the Appeals Council declined review, Strysik filed this lawsuit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross motions for summary judgment. For the following reasons, Strysik's motion is granted, the government's is denied, and the case is remanded for further proceedings consistent with this opinion:

### Procedural History

Strysik first applied for SSI in October 2007, but an ALJ denied his claim in April 2010. (Administrative Record ("A.R.") 71-81.) Strysik filed the SSI application relevant to this case three months later, claiming a disability onset date of February 28, 2008. (Id. at 149.) After his claim was denied initially and upon

reconsideration, (id. at 86-87), Strysik requested and was granted a hearing before an ALJ. That hearing took place on April 11, 2012. (Id. at 35-67.) On June 22, 2012, the assigned ALJ denied Strysik's application. (Id. at 29.) Strysik submitted additional records to the Appeals Council in support of his request for review, but it determined that the new information "does not provide a basis for changing the [ALJ]'s decision," and denied his review request. (Id. at 1-2.) Because the Appeals Council declined review, the ALJ's ruling represents the final decision of the Commissioner of Social Security Administration. *See Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015). Strysik filed this lawsuit seeking judicial review of the Commissioner's decision, *see* 42 U.S.C. § 405(g), and the parties consented to this court's jurisdiction, *see* 28 U.S.C. § 636(c); (R. 7).

## Facts

Strysik claims that after he spent 20 years working in construction, he fell while on the job in 2005, resulting in a rotator cuff and elbow injury that required several surgeries. He has not worked since. Strysik says that in addition to his shoulder pain, he suffers from debilitating back pain that makes it difficult for him stand and walk. Strysik also claims to be disabled by depression and anxiety, which manifest in symptoms including fatigue, difficulty concentrating, insomnia, and a reluctance to participate in social activities. According to Strysik, the combination of these difficulties has left him completely unable to work. At his hearing before the ALJ Strysik presented both documentary and testimonial evidence in support of his claims.

## A.     Medical Evidence

The medical record reveals that beginning in 2002 Strysik had at least two hospital visits that were related to alcohol abuse.  In September 2002 he was admitted to the hospital with swelling in his legs related to alcoholic hepatitis. (A.R. 239.)  He was noted to be intoxicated when he arrived at the hospital and was diagnosed with alcoholic cirrhosis of the liver.  (Id. at 243.)  Four months later he received treatment for right leg swelling and pain after he was struck with a metal rake.  (Id. at 262, 264.)  When he arrived at the hospital Strysik admitted to using alcohol that night and was found to have a blood alcohol level of .322.  (Id. at 260.) Strysik told the doctor that he drank about six beers a day, but based on the blood alcohol results, the doctor noted that "[i]t is certainly likely that the patient's statements are not consistent with the patient's current alcohol consumption."  (Id. at 260-61.)  Because of his swollen legs Strysik was tested for acute deep vein thrombosis, but the results came back negative.  (Id. at 280.)

After Strysik originally applied for SSI he was referred to clinical psychologist John Brauer, Psy.D., for a mental status examination.  (Id. at 386.) Strysik reported to Dr. Brauer that he had never received mental health treatment, but that he was experiencing depression that was worsening over time.  (Id. at 386-87.)  He said that he had no hobbies, interests, or friends and reported drinking only once a month, two or three drinks at a time.  (Id. at 387.)  Dr. Bauer described Strysik's affect as tearful and depressed, but noted that his capacity for abstraction, concentration, and judgment appeared intact.  (Id. at 387-88.)  Dr. Bauer diagnosed

Strysik as suffering from major depression and anxiety, stemming from a lack of social connection.  (Id. at 388.)

In the summer of 2008 Strysik underwent a second psychological evaluation, this time with clinical psychologist Erwin Baukus, Ph.D.  Strysik reported that he was not taking any medications but that he had a pervasive loss of interest in almost all activities, decreased energy, sleep disturbances, and passive thoughts of suicide.  (Id. at 392.)  He also reported difficulty concentrating and thinking.  (Id.)  He reported having no problems with alcohol and visiting only with family.  (Id. at 393.)  Dr. Baukus diagnosed Strysik as having chronic adjustment disorder with depression and anxiety.  (Id. at 395.)

Strysik was hospitalized again in the fall of 2009, when he was admitted with a blood alcohol level of .363 after expressing suicidal thoughts.  (Id. at 293.)  Strysik also was experiencing right lower leg swelling with mild pedal edema.  (Id. at 295.)  When his condition improved, he was transferred to a psychiatric unit, where he reported to his doctors that he was drinking at least a couple of bottles of beer a day.  (Id. at 293-94.)  He reported to another doctor that he drank six to ten beers a day.  (Id. at 297.)  Strysik was given medications for depression and was released with recommendations that he follow up with medication management.  (Id. at 312.)

In June 2010 Strysik sought out-patient treatment for a bump on his inner right calf and for swelling in his legs.  (Id. at 414-15.)  He reported that he had stopped taking Prozac because it gave him "weird dreams" and he could not afford to see a psychiatrist.  (Id. at 415.)  When the doctor told Strysik that he smelled of

alcohol, Strysik denied feeling the need to cut back on his drinking despite admitting that he and his brother had "really tied one on last night." (Id. at 415-16.) The doctor wrote that Strysik's affect was sad and exaggerated, and that he cried at times while speaking of his mental health issues. (Id. at 416.) The doctor diagnosed Strysik as having uncontrolled hypertension, a depressive disorder, and skin lipoma, with suspected alcohol abuse. (Id. at 417.) Two days later Strysik had the bump on his leg drained, and the treating physician observed that he had prominent edema in both legs. (Id. at 418-19.)

In August 2010 Strysik was still experiencing edema in his legs below the knees. (Id. at 420.) His doctor noted that he smelled of alcohol and his eyes were jaundiced, and he appeared anxious and apprehensive. (Id. at 421.) He also appeared to have a shortened attention span and an inability to concentrate on any task or conversation because he was so easily distracted. (Id.)

Consulting examiner Dr. Charles Carlton examined Strysik in September 2010. (Id. at 422.) Strysik told Dr. Carlton that he was not undergoing psychotherapy but that he was taking psychiatric medications, and denied any history of alcohol abuse. (Id. at 423.) Dr. Carlton wrote, without explanation, that Strysik "is independent with [activities of daily living]." (Id.) Dr. Carlton observed that Strysik had no edema, was able to rise from sitting to standing and walk 50 feet without an assistive device, and had a full range of motion in all of his joints except his right elbow and knees. (Id. at 424.) He also had some decreased range of motion in his lumbar spine. (Id.) Dr. Carlton wrote that he "believes" that Strysik

can sit safely but that it "is possible his standing tolerance could be limited." (Id. at 425.) He also wrote that he believes Strysik can "safely perform tasks that involve lifting up to 20 lbs. from waist level and above." (Id.)

In October 2010 psychologist David Voss, Ph.D., completed a Psychiatric Review Technique ("PRT") form and a Mental Residual Functional Capacity Assessment ("MRFCA") form based on his review of the medical file. (Id. at 431-47.) Dr. Voss checked boxes on the PRT form indicating that Strysik has an affective disorder and a substance addiction disorder. (Id. at 431.) In the section of the form requiring him to rate the degree of limitation with respect to the "B criteria" of the listings for mental health disorders, Dr. Voss rated Strysik as being moderately limited in social functioning and as having mild difficulties in activities of daily living and maintaining concentration, persistence, or pace. (Id. at 441.) In the portion of the form allowing comments, Dr. Voss wrote that Strysik's statements about his symptoms and limitations were only partially credible because, according to him, they were out of proportion to the symptoms documented in the medical evidence. (Id. at 443.) In section I of the MRFCA form, Dr. Voss checked a number of boxes giving his summary conclusions regarding the impact of Strysik's mental health impairments in 20 categories related to understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (Id. at 445-46.) For the majority of these categories, Dr. Voss checked the "not significantly limited" box. (Id.) But Dr. Voss checked boxes indicating that Strysik is moderately limited in the following five categories: (1) "ability to understand and

remember detailed instructions"; (2) "ability to carry out detailed instructions"; (3) "ability to maintain attention and concentration for extended periods"; (4) "ability to interact appropriately with the general public"; and (5) "ability to accept instructions and respond appropriately to criticism from supervisors." (Id.) In section III of the form, Dr. Voss provided a narrative assessment of Strysik's residual functional capacity ("RFC"). (Id. at 447.) There Dr. Voss wrote that the "medical evidence indicates that the claimant can maintain the attention, concentration and persistence necessary to carry out simple one and two-step tasks at a consistent pace." (Id.) He also wrote that Strysik has mild to moderate social skill deficits and that his contact "with co-workers and the general public should be minimized." (Id.)

In October 2010 consulting physician Dr. James Madison filled out a physical RFC assessment form after reviewing the medical record. (Id. at 456-63.) Dr. Madison opined that Strysik can perform light work but only occasionally climb ladders, ropes, or scaffolds and only frequently reach overhead with his right arm or handle with either hand. (Id. at 457-59.) In the comments portion of the form, Dr. Madison noted that Strysik's allegations included "right shoulder and elbow injury, hearing loss, depression, and anxiety," and opined that those allegations "are credible," explaining that Strysik has slightly decreased hearing in one ear and slightly diminished range of motion in his lumbar spine, knees, and right elbow. (Id. at 463.)

In late 2010 through the spring of 2011, Strysik continued to seek treatment for the mass on his leg and lower leg swelling. He also underwent radiology testing on his liver which showed results consistent with cirrhosis. (Id. at 597.) In an April 2011 evaluation before he underwent surgery on the mass in his calf, his doctor observed pitting edema on both sides of his lower extremities. (Id. at 631.)

Five months after his calf surgery, in October 2011, Strysik was admitted to the hospital with intractable back pain. (Id. at 540-41.) Tests showed that he had a contained herniated nuclear pulposus at the L5-S1 level of his spine, and he was assessed with a lumbar strain and possible disc pain. (Id. at 543.) An MRI showed scattered levels of disc desiccation and degenerative disc disease throughout the lumbar spine. (Id. at 554.) The degeneration was most significant at the L5-S1 level where the technician observed a broad-based disc bulge and small focal central disc protrusion. (Id.) Strysik was also observed to have varicose veins, and was diagnosed with thrombocytopenia most likely secondary to chronic alcohol abuse and cirrhosis. (Id. at 546.)

B.      **Strysik's Hearing Testimony**

At his hearing before the ALJ, Strysik explained that he was a construction worker from 1985 until 2005, when he stopped working because of his shoulder injury and because his mental state was deteriorating. (A.R. 39-41.) The ALJ asked why his earnings reports only showed income in 2003 and 2005 if he had worked for 20 years, but Strysik said he had been paid by check and had reported his income. (Id.) He testified that he currently is living with his father in a house

owned by his cousin. (Id. at 44.) He said that his pain is so bad that he does not do any household chores except rinsing dishes and that his father does everything from cooking, cleaning, and laundry to helping Strysik get on his shoes and socks. (Id. at 44-45.) He described his back pain as radiating from his tailbone down to his right leg, with a level of eight out of ten at times. (Id. at 45-46.) Strysik said that sometimes he gets muscle spasms in his back and then the pain is "unreal" and so severe that he is unable to walk at all. (Id. at 46-47.)

In explaining how his pain limits him, Strysik testified that he can stand for only about 30 to 45 minutes before he needs to sit or lay down, but he also testified that after he gets up he usually does not "sit down until I have to go to bed." (Id. at 49.) He said that he can walk for only 50 yards without an assistive device and testified that he uses a walker to get around at home. (Id. at 45, 49.) As for his depression, Strysik testified that even when he is taking his medication he has episodes of depression that last for days and weeks at a time and that they interfere with his concentration and sleep. (Id. at 51-53, 55.) He explained that he has a big family and is close to his siblings who stop by to check on him and his father, but that he does not engage in social activities outside of the family. (Id. at 56.) In describing his typical day, Strysik said that he crawls out of bed in the morning and waits for his father to help him with his shoes and socks, then eats breakfast and listens to sports standing up, takes care of stray cats, and lies in bed watching television. (Id. at 53-55.)

**C.     Vocational Expert's Testimony**

Vocational Expert ("VE") Richard Fisher provided testimony regarding the kind of work a person with certain hypothetical limitations proposed by the ALJ could perform.  The ALJ asked him what kinds of jobs could be performed by a person with an RFC for light work with certain exertional limitations and with a limitation to only unskilled work tasks that could be learned by demonstration or in 30 days or less.  (A.R. 59-60.)  The VE testified that such a person could work in jobs including cashier II, housekeeping/cleaner, and routing clerk.  (Id.) The ALJ asked what impact there would be if a person with those restrictions were also limited to only occasional and superficial contact with the general public and occasional interactions with co-workers and supervisors.  (Id. at 61.)  The VE testified that the social limitation would eliminate the cashier II job but would have no impact on the housekeeping/cleaner and routing clerk jobs.  (Id.)  The VE testified that a housekeeper's contact with the public is occasional, but brief and superficial.  (Id. at 64.)

**D.     The ALJ's Decision**

On June 22, 2012, the ALJ issued her decision concluding that Strysik is not disabled and therefore not entitled to SSI.  (A.R. 29.)  In applying the standard five-step sequence for assessing disability, *see* 20 C.F.R. § 416.920(a)(4); *Stepp v. Colvin*, 795 F.3d 711, 716 (7th Cir. 2015), the ALJ found at step one that Strysik had not engaged in substantial gainful activity since his application date and that he has severe impairments in the form of alcohol abuse disorder, depression, degenerative

disc disease, and obesity. (Id. at 18.) At step three the ALJ applied the special technique to measure the limitations stemming from Strysik's depression and anxiety. (Id. at 20.) She concluded that Strysik has mild restrictions in activities of daily living and social functioning and moderate difficulties with respect to concentration, persistence, or pace. (Id.) Before turning to step four, the ALJ determined that Strysik has the RFC for light work with certain limitations including the ability to perform only unskilled work tasks that can be learned by demonstration or in 30 days or less. (Id. at 21.) In explaining that assessment the ALJ wrote that she did not find Strysik's testimony credible and that she gave great weight to the opinions of the state agency medical and psychological consultants. (Id. at 25-26.) At step four the ALJ determined that Strysik had no past relevant work, but at step five she concluded that his RFC would allow him to perform the jobs of cashier II, housekeeper/cleaner, and routing clerk. (Id. at 28.) Accordingly, the ALJ concluded that Strysik is not disabled within the meaning of the Social Security Act. (Id. at 29.)

## Analysis

In moving for summary judgment Strysik raises two core challenges to the ALJ's decision. First, he argues that she erred in crafting his RFC by excluding certain mental and physical limitations that he says are supported by the evidence. Second, he argues that the ALJ committed reversible error in analyzing his credibility. This court reviews the ALJ's decision only to ensure that it is supported by substantial evidence, defined as "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Stepp*, 795 F.3d at 718 (quotation and citation omitted). Under that standard, the court will not substitute its judgment for the ALJ's, reconsider evidence, or reweigh the claimant's credibility. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). At the same time, the court will not "simply rubber-stamp the Commissioner's decision without a critical review of the evidence." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Instead, the court's role is to ensure that the ALJ built a "logical bridge from the evidence" to her conclusion that the claimant is not disabled, explaining "why contrary evidence does not persuade." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (internal quotation and citation omitted).

## A.     The Credibility Assessment

Because an erroneous credibility finding typically results in a remand, *see Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014), the court will start with Strysik's contention that the ALJ committed reversible error in assessing his credibility. This court is required to be "extremely deferential" in reviewing the ALJ's credibility assessments and will overturn a credibility finding only where it is "patently wrong." *See Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013) (quotation and citation omitted). That standard requires this court to give the ALJ's determination "a commonsensical reading," rather than nitpicking it "for inconsistencies or contradictions." *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). That said, the court's deference is not unlimited, and it must ensure that the ALJ considered factors imposed by regulation and supported her credibility

assessment by pointing to record evidence. *See Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012).

Strysik first faults the ALJ's credibility finding because as part of her analysis she wrote that her "review of the medical records indicates that the claimant's symptoms and complaints are not supported by objective medical evidence consistent with a finding of total disability." (A.R. 22.) Although he is correct that the regulations prohibit an ALJ from discounting a claimant's subjective complaints of pain solely because objective evidence does not substantiate the allegations, *see Adaire v. Colvin*, 778 F.3d 685, 687 (7th Cir. 2015), an ALJ may point to a mismatch between the objective evidence and the claimant's self-reports as a reason to suspect symptom exaggeration, *Jones*, 623 F.3d at 1161. Here the ALJ pointed to objective evidence that supported her conclusion that Strysik's functional capacity is greater than he suggests, including the findings of several examining physicians. So this is not a case where the ALJ doubted the claimant's pain because she thought it could not be explained by objective findings, *see Adaire*, 778 F.3d at 687, but rather a case where the available objective evidence showed that Strysik could walk, sit, lift, and perform other activities to a degree beyond that which he described in his hearing testimony. Strysik argues that the ALJ mischaracterized this evidence and points to medical records regarding his back treatment after October 2011, but he submitted those records only to the Appeals Council, not to the ALJ, and he has not challenged the Council's treatment of those records. (R. 17, Pl.'s Mem. at 18; A.R. 783.) Accordingly, the ALJ did not commit

reversible error in citing objective evidence as one of several factors she considered in discounting his subjective complaints.

Strysik next faults the ALJ for characterizing as "evasive" his testimony describing his work history. (A.R. 25-26.) Specifically, she doubted his testimony that he worked for a construction company from 1985 to 2005 because his records only showed earnings for 1996, 2003, and 2005. (Id. at 26.) The ALJ saw a discrepancy between this evidence and Strysik's testimony that he was paid by check and filed tax returns for 20 years. (Id.) Strysik argues that the ALJ should have attributed this discrepancy to his memory problems rather than to a lack of candor. (R. 17, Pl.'s Mem. at 18-19.) But that is an invitation for the court to reweigh this part of the record and substitute its judgment for the ALJ's, when the standard of review precludes this court from doing so. *See Elder*, 529 F.3d at 413. In any event, none of the evidence he points to supports his suggestion that he is so limited in memory that he cannot recall whether he worked for 20 years or for three. Instead, the evidence Strysik cites suggests that although he has some problems with immediate recall, he has no deficiency in long-term memory, (A.R. 394), and his inability to recall details about his medical history during one appointment hardly supports his suggestion that poor memory is behind his inability to explain the discrepancy between his testimony and his earnings record. Moreover, at the end of the hearing the ALJ told Strysik's attorney that she would keep the record open to allow him to submit additional evidence to clarify Strysik's work history. (Id. at 65-66.) Apparently Strysik did not take advantage of that

opportunity, so it should come as no surprise that the ALJ found the unexplained discrepancy to reflect poorly on his overall credibility. *See Berger*, 516 F.3d at 545-46 (affirming ALJ's decision to discount claimant's credibility based in part on failure to report some earnings).

Similarly, Strysik asks the court to put a different veneer than that applied by the ALJ on evidence that he was inconsistent in his reporting of his alcohol consumption. In particular, he argues that the ALJ should have considered the likelihood that a person struggling with alcohol dependence would be in denial about his behavior and asserts that the ALJ should have viewed his inconsistency on this point as a byproduct of that denial, rather than as an indicator of his lack of candor. (R. 17, Pl.'s Mem. at 20.) Of course the ALJ could have viewed the evidence through the lens he proposes, but it is decidedly not this court's role to second guess what the evidence means. *Elder*, 529 F.3d at 413. There is ample evidence that Strysik's doctors doubted his truthfulness around the issue of alcohol consumption. (A.R. 261, 351.) And despite being hospitalized twice for dangerous levels of intoxication, Strysik denied having any history of alcohol abuse during his examination with a consulting physician. (Id. at 423.) Given all of that evidence, this court is unable to say that it was "patently wrong" for the ALJ to find that Strysik's inconsistency around reporting his alcohol consumption weighed against his credibility.

Strysik also challenges the ALJ's determination that his description of his daily activities lacks credibility. The ALJ noted that Strysik testified that he

needed help with everything from putting on his socks and shoes to cooking his meals to cleaning, yet he reported to Dr. Carlton that he was "independent" with his daily activities. Strysik argues that because Dr. Carlton's notes offer no details as to what he means by "independent," there is no inconsistency between that report and Strysik's testimony. But the ALJ was entitled to see a red flag in Dr. Carlton's brief notation, given that Strysik painted a portrait of almost total dependence on his father during the hearing. *See Bates*, 736 F.3d at 1098 (noting that even "a minor discrepancy" is sufficient to support an adverse credibility finding). And as the ALJ noted, the same month that Strysik told Dr. Carlton he was independent in activities of daily living, he filled out a function report in support of his disability claim stating that his father prepared his meals (he also wrote that his father helped him with everything from showering to taking his medicine). (A.R. 26, 188.) Accordingly, Strysik's attempt to explain the discrepancy by arguing that his back pain worsened between Dr. Carlton's examination and the hearing is unpersuasive. (R. 17, Pl.'s Mem. at 19.) Although the ALJ could have done more to explain why she thought Strysik's description of his limited daily activities was exaggerated, a commonsense reading of her explanation demonstrates that the reasons she articulated are supported by the evidence. *See Jones*, 623 F.3d at 1160. That is all that is required.

Strysik's strongest attack on the ALJ's credibility determination is his argument that she violated agency regulations when she gave great weight to state physician Dr. Madison's opinion, but did not explain why she diverged from his view

that Strysik's allegations were credible. (R. 17, Pl.'s Mem. at 20.) As he points out, where a state medical consultant provides a finding regarding "the credibility of the individual's statements about limitations or restrictions due to symptoms," the ALJ is required to "consider and weigh this opinion." *See* SSR 96-7p, 1996 WL 374186, at *8 (July 2, 1996). It is true that the ALJ gave "great weight" to Dr. Madison's opinion without explicitly discussing his notation that "[t]he claimant's allegations are credible." (A.R. 26, 463.) But Dr. Madison's comments describe the credible allegations as "right shoulder and elbow injury, hearing loss, depression, and anxiety." (Id. at 463.) He wrote nothing about the limiting impacts of Strysik's mental impairments or the credibility of his reports of daily activities, and the ALJ adopted his opinion regarding the limiting impacts of Strysik's credible physical impairments. *Compare with Strong ex rel. M.H. v. Astrue,* No. 11 CV 5922, 2012 WL 6186831, at *9 (N.D. Ill. Dec. 12, 2012) (remanding where ALJ ignored two state consultants' findings that claimant's allegations and reports of daily activities were credible). In the end, given that the ALJ adopted all of Dr. Madison's findings with respect to the limiting effects of Strysik's allegations, and because an ALJ's credibility determination does not have to be perfect to survive review, *see Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012), the court concludes that Strysik has not shown that the case must be remanded for a fresh credibility assessment.

## B.     The RFC Determination

Strysik also challenges the ALJ's RFC assessment, arguing that she failed to incorporate mental and physical limitations that are supported by the record

evidence within the assessment and within the hypotheticals posed to the VE. A claimant's RFC is an assessment of his maximum work capacity, *Elder*, 529 F.3d at 412, and the authority to determine the RFC is reserved for the Commissioner, 20 C.F.R. § 416.927(d). "As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). The other side of that coin is that the ALJ need not incorporate into the RFC or hypothetical question limitations that she does not accept as credible. *See Schmidt v. Astrue*, 496 F.3d 833, 845-46 (7th Cir. 2007). Here, Strysik faults the ALJ for failing to incorporate into the RFC Dr. Carlton's opinion that Strysik can safely lift only from waist level. He also argues that the evidence regarding his lower extremity edema would impose more severe limits on his ability to walk and stand than those the ALJ included in the RFC. Strysik further argues that the portion of the RFC limiting him to "unskilled work tasks that can be learned by demonstration or in 30 days or less," (A.R. 21), does not adequately capture his limitations in social functioning and concentration, persistence, or pace. As explained below, the court concludes that the ALJ's RFC assessment adequately accounts for Strysik's physical limitations, but not his mental impairments.

### 1. Physical Limitations

In challenging the physical limitations the ALJ built into her RFC assessment, Strysik argues that she improperly failed to include Dr. Carlton's opinion that he can only lift up to 20 pounds safely "from waist level and above."

(R. 17, Pl.'s Mem. at 15; A.R. 425.)  To be clear, the ALJ's finding that Strysik could perform a limited range of light work necessarily incorporates a limitation to lifting no more than 20 pounds, *see* 20 C.F.R. § 416.967(b), so it is just Dr. Carlton's limitation to lifting from waist level that Strysik argues is missing from the RFC. As the government points out, the ALJ only gave some weight to Dr. Carlton's opinion, finding aspects of that opinion too vague to assist in defining Strysik's physical limitations.  (A.R. 27.)  By contrast, she gave great weight to the opinions of the consulting physicians who reviewed the entire record, including Dr. Carlton's opinion, but did not incorporate the waist-level lifting restriction.   (Id. at 26.) Consulting physician Dr. Madison acknowledged Dr. Carlton's note regarding waist-level lifting, but cited Dr. Carlton's clinical findings to support his opinion that Strysik can occasionally lift up to 20 pounds without the waist-height restriction. (Id. at 457, 463.)  The fact that the ALJ gave more weight to Dr. Madison's opinion than to Dr. Carlton's explains why she did not incorporate the restriction regarding waist-height lifting into her RFC assessment.

Strysik argues that the ALJ's explanation is insufficient because, according to him, she did not consider the examining relationship between Dr. Carlton and Strysik before giving greater weight to the non-examining physicians' opinions with respect to lifting.  (R. 17, Pl.'s Mem. at 16.)  It is true that the regulations state that an ALJ generally will give more weight to the opinion of a doctor who has examined the claimant than to one who has not, *see* 20 C.F.R. § 416.927(c), but the Seventh Circuit has made clear that an ALJ can prioritize a consulting physician's opinion

over an examining physician's where they conflict, as long as she provides an explanation that is supported by the record. *See, e.g., Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008). Even the cases that Strysik cites here stand for the proposition that an ALJ may not reject a treating source's opinion based *solely* on a consulting physician's opinion, *see Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003), or without explaining why, *see Huber v. Astrue*, 395 Fed. App'x 299, 302 (7th Cir. 2010). Although the ALJ in this case could have done more to articulate her balancing of the opinions of Dr. Carlton and the consulting physician with respect to Strysik's physical RFC, she explained that she found Dr. Carlton's opinion vague in some respects and that Dr. Madison's opinion incorporated Dr. Carlton's clinical findings with respect to Strysik's lifting capacity. (A.R. 26-27.) She also reasoned that the consulting physicians' opinions mesh with the medical evidence showing that Strysik received only limited treatment for back pain. (Id. at 26.) That articulation is sufficient to explain why the ALJ omitted from the RFC a restriction to lifting 20 pounds only from the waist up. *See Elder*, 529 F.3d at 416 (noting that "minimal articulation" of weight given physician opinions is sufficient).

Strysik also argues that the ALJ overlooked an entire line of evidence documenting his struggles with lower extremity edema and asserts that she erroneously failed to work into the RFC any accommodations for that problem. (R. 17, Pl.'s Mem. at 16-17.) But the ALJ did not overlook this evidence. At the second step of the analysis the ALJ acknowledged several reports of Strysik's soft tissue edema and of lower extremity swelling that coincided with his failure to take

blood pressure medication. (A.R. 19.) And Strysik has not pointed to any evidence that his lower extremity swelling translates to any functional limitations beyond those set forth in the RFC assessment. For example, he has not pointed to any evidence that he is required to elevate his legs to relieve the swelling, as often is the situation in cases involving edema. *See, e.g.*, *Williams v. Colvin*, 757 F.3d 610, 615 (7th Cir. 2014); *Mueller v. Colvin*, 524 Fed. App'x 282, 285-86 (7th Cir. 2013). Although he cites one medical record that he says demonstrates that his edema resulted in "difficulty walking due to leg pain," (R. 17, Pl.'s Mem. at 17), that record does not tie his pain to swelling in his legs or reference edema at all, (A.R. 273). Because Strysik has not identified any functional limitation connected to his leg swelling that the ALJ failed to incorporate into the RFC, he has not shown that the ALJ committed reversible error in failing to address that problem more explicitly in her RFC assessment.

### 2.    Mental RFC

Strysik's arguments gain traction in the course of his challenge to the ALJ's decision to account for the limitations related to his depression and anxiety by limiting his RFC to "unskilled work tasks that can be learned by demonstration or in 30 days or less." (A.R. 21.) As Strysik points out, the ALJ found that he has moderate limitations with respect to concentration, persistence, or pace, but failed to explicitly incorporate those limitations into the RFC. (Id. at 20-21.) Although the Seventh Circuit has made clear that an ALJ is not required to explicitly include the terms "concentration, persistence, or pace" into the RFC to adequately account

for such limitations, it has also made clear that using terms like "unskilled" work or "simple, repetitive tasks" will not necessarily capture those limitations. *See Yurt*, 758 F.3d at 857-59; *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620-21 (7th Cir. 2010). That is because "unskilled" work is that which can be learned in 30 days or less, and terms like "simple, routine, and repetitive" tasks refer to that ability to learn a job. *Varga v. Colvin*, 794 F.3d 809, 814 (7th Cir. 2015). But the ability to learn a job is unrelated to the ability to maintain the concentration and persistence required to perform the work at a required pace, once it is mastered. *Id.* Accordingly, the Seventh Circuit has repeatedly remanded cases where the ALJ erroneously used limitations like "unskilled" or "routine" work to account for limitations in a claimant's ability to maintain concentration, persistence, or pace. *See, e.g., id.* at 814-15; *Yurt*, 758 F.3d at 859; *Jelinek v. Astrue*, 662 F.3d 805, 813-14 (7th Cir. 2011); *O'Connor-Spinner*, 627 F.3d at 620.

The government defends this aspect of the ALJ's RFC assessment in part by relying on *Johansen v. Barnhart*, 314 F.3d 283, 288 (7th Cir. 2002), where the Seventh Circuit concluded that an RFC limiting a claimant to repetitive, low-stress work adequately accommodated his moderate limitations in maintaining a schedule or sustaining an ordinary routine, where the consulting physician opined that the claimant's limitations allowed him to perform repetitive, low-stress work. But in *Johansen,* the language the ALJ incorporated into the RFC consisted of the doctor's translation of the claimant's particular limitation. *Id.* at 288-89. Here, by contrast, no doctor opined that Strysik's moderate limitations in concentration, persistence,

or pace translate to an ability to perform unskilled work that can be learned by demonstration or in 30 days or less. Nevertheless, the government argues that because consulting physician Dr. Voss opined that Strysik can maintain the attention, concentration, and persistence required to complete simple one- and two-step tasks at a consistent pace, this case is like *Johansen* and the RFC should be sustained. (R. 19, Govt.'s Mem. at 3-4.) But again, the ALJ did not limit Strysik in the way Dr. Voss outlined because the RFC is devoid of any reference to one- or two-step tasks. (A.R. 21.)

Acknowledging this lack of translation, the government falls back on arguing that the ALJ's failure to incorporate Dr. Voss's limitation to one- or two-step tasks into the RFC was harmless because, it says, "explicitly adding a limitation of 'simple one- and two-step tasks' to Strysik's RFC and the hypothetical questions posed to the vocational expert would not change the result in this case." (R. 19, Govt.'s Mem. at 4.) That is because the ALJ found that one of the jobs Strysik's RFC would allow him to perform is that of cleaner/housekeeping, as described in the Dictionary of Occupational Title's ("DOT") entry 323.687-014, and according to the government, "[t]he DOT makes clear that this job requires only one- to two-step tasks." (Id.) But the government quotes no language from the DOT entry to illustrate how that is clear, and this court's review of the job description reveals that it is a far murkier proposition than the government suggests. The only reference to "one- or two-step" limitations in the entry comes under the heading of "reasoning," and says that a cleaner/housekeeper must "[a]pply commonsense

understanding to carry out simple one- or two-step instructions." 1991 WL 672783. It is not at all clear that just because a job can be explained in one- or two-step instructions that it does not involve tasks that may entail more than two steps. And again, the Seventh Circuit has made clear that a claimant's ability to reason and understand tasks or instructions is not the same thing as the ability to persist in those tasks at the required pace. *See Varga*, 794 F.3d at 814-15. Because the cleaner/housekeeping entry the government cites does not explicitly demonstrate that a person performing that job would be limited to one- or two-step tasks, the court is unable to conclude that the VE's testimony would have been the same if the ALJ had incorporated the limitation to one- or two- step tasks into the RFC. Accordingly, the court will not view this omission as harmless error. *See Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013) (noting that error is harmless "if we can predict with great confidence that the result on remand would be the same").

Strysik also challenges the ALJ's failure to incorporate into the RFC the specific limitations that Dr. Voss recorded by checking several boxes for moderate limitations in Section I, the "Summary Conclusions" portion of his MRFCA form. Specifically, the ALJ did not account for Dr. Voss's check marks indicating his opinion that Strysik has moderate limitations in the ability to understand, remember, and carry out detailed instructions, to maintain attention and concentration for extended periods, to interact appropriately with the general public, and to accept instructions and respond appropriately to criticism from supervisors. (A.R. 445-46.) In response, the government relies on a Third Circuit

and two district court cases for a position that the Seventh Circuit has rejected. (R. 19, Govt.'s Mem. at 5-7.) Namely, the government argues that Section I does not represent Dr. Voss's RFC opinion, and that only Section III of the MRFCA form constitutes an RFC opinion because that is where the physician conveys a narrative description of his opinion. After the government submitted its brief in this case, the Seventh Circuit addressed this same argument in *Varga*, 794 F.3d at 816. There, the government relied on the same Third Circuit case the Commissioner cites here, *Smith v. Commissioner of Social Security*, 631 F.3d 632, 636-37 (3d Cir. 2010), to argue that the ALJ is not required to incorporate into the RFC findings noted in Section I of the MRFCA form. *See Varga*, 794 F.3d at 816. As it argues here, there the government asserted that Section I is "merely a worksheet" and that Section III is where those observations are translated into a mental RFC. *Id.* The Seventh Circuit rejected that argument, noting that it "has declined to adopt a blanket rule that checked boxes in Section I of the MRFCA form indicating moderate difficulties in mental functioning need not be incorporated into a hypothetical to the VE." *Id.* Instead, it characterized the Section I observations as "medical evidence which cannot just be ignored." *Id.*; *see also Yurt*, 758 F.3d at 859 (faulting ALJ for failing to incorporate into hypothetical MRFCA findings that claimant had moderate difficulties in concentration, persistence, or pace). Accordingly, the ALJ was obliged either to incorporate Dr. Voss's findings from Section I of the MRFCA form into the hypothetical or explain why she decided to omit them. *See Varga*, 794 F.3d at 816.

Her failure to do so here means that the RFC did not adequately capture the whole of Strysik's limitations with respect to concentration, persistence, or pace.

As a final matter, Strysik argues that the ALJ erroneously found that he has mild, rather than moderate, difficulties in social functioning and she incorrectly failed to incorporate into the RFC any limitations accounting for his difficulties in social functioning. As he points out, the ALJ acknowledged that the state agency consulting psychologist who weighed in on this issue opined that Strysik has moderate difficulties in social functioning. (A.R. 20.) The ALJ explained her decision to assign only mild difficulties in this area by noting that he sometimes attends sports events with a family member or attends family gatherings, and that he talks on the phone with family members and interacts with his siblings regularly. (Id.) But Dr. Voss opined that Strysik has difficulties when it comes to interacting with the general public and supervisors, and made clear that his contact "with co-workers and the general public should be minimized." (Id. at 446-47.) It is unclear how Strysik's willingness to maintain family ties or go out in public when accompanied by a family member casts doubt on Dr. Voss's opinion that he would struggle to interact with people outside his family. The ALJ's explanation suggests that she erroneously equated the ability to interact with family to the ability to handle social interactions with strangers and leaves the pronounced impression that she substituted her own lay opinion for that of the consulting physician. *See Clifford*, 227 F.3d at 870 (noting that "an ALJ must not

substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record").

The government argues that even if the ALJ erred in downgrading Strysik's social functioning limitation from moderate to mild, that any such error was harmless because, once again, it asserts that the cleaner/housekeeping description in DOT entry 323.687-014 "involves no significant social interaction." (R. 19, Govt.'s Mem. at 8.) But again, it does not cite any specific language from the DOT to support that assertion. On the one hand, it is true that under the heading "People: 8 – Taking Instructions – Helping," the DOT describes this aspect of the job as "not significant." 1991 WL 672783. But on the other hand, the narrative description of the job specifies that a person performing this job "renders personal assistance to patrons." *Id.* As such, the court is not persuaded that the social functioning required for this job is as insignificant as the government insists. Moreover, at the hearing the VE testified that if a person with Strysik's RFC were limited to no contact with the public, such a limitation would eliminate the cleaner/housekeeping job, because there is occasional public contact in that role, although the VE described such contact as "brief and superficial." (A.R. 64.) It is not clear whether brief and superficial contact, which the ALJ defined as occasional, is the same as minimal contact, which is all Dr. Voss thought Strysik capable of handling. The DOT entry for the cleaner/housekeeping position describes occasional tasks as those that exist up to one-third of the time. 1991 WL 672783. The government has not argued that contact with the general public up to one-third of the time equates to

minimal contact.  Accordingly, the court is unable to conclude that the ALJ's failure to incorporate any social functioning limitations into the RFC was harmless.  *See Schomas*, 732 F.3d at 707.  For all of these reasons, the case must be remanded to the ALJ to reformulate the RFC assessment to properly account for Strysik's limitations in concentration, persistence, or pace and social functioning.

## Conclusion

For the foregoing reasons, Strysik's motion for summary judgment is granted and the Commissioner's is denied.  The case is remanded for further proceedings consistent with this opinion.

**ENTER:**


_____
**Young B. Kim**
**United States Magistrate Judge**

28